UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADANE P. DEJESUS,

                              Plaintiff,

       against

NANCY A. BERRYHILL, Commissioner of Social
Security,

                              Defendant.

CIVIL ACTION NO.: 18 Civ. 3170 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE**, United States Magistrate Judge:

## I.    INTRODUCTION

Plaintiff Adane P. DeJesus ("Ms. DeJesus") commenced this action pursuant to
Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  She seeks
review of the January 20, 2016 decision by the Commissioner (the "Commissioner") of the Social
Security Administration ("SSA"), denying her application for Supplemental Security Income
("SSI") and Disability Insurance Benefits ("DIB") under the Act.  Ms. DeJesus contends that the
decision of the Administrative Law Judge ("ALJ") was erroneous, not supported by substantial
evidence, and contrary to law, and asks the Court to (a) reverse the Commissioner's decision for
the calculation and award of benefits, or (b) remand for a new hearing to reconsider the
evidence.

The parties have cross-moved for judgment on the pleadings, pursuant to Rule 12(c) of
the Federal Rules of Civil Procedure.  On June 6, 2017, Ms. DeJesus filed a motion for judgment
on the pleadings (ECF No. 12), and on July 17, 2017 the Commissioner cross-moved (ECF No. 16).

For the reasons set forth below, Ms. DeJesus' motion (ECF No. 12) is GRANTED and the Commissioner's motion (ECF No. 16) is DENIED.

## II.    BACKGROUND

### A.    Procedural History

On December 21, 2012, Ms. DeJesus filed an application for DIB[1] and SSI benefits,[2] alleging that she had been unable to work since September 6, 2011.  (Joint Stipulation of Facts ("JSF") 1 (ECF No. 14)).  On April 24, 2013, the SSA denied Ms. DeJesus's application, finding that she was not disabled.  (SSA Administrative Record ("R.") 149–55 (ECF No. 11)).  On June 6, 2013, Ms. DeJesus filed a written request for a hearing before an ALJ.  (JSF 1).  On December 30, 2013, she appeared before ALJ Kenneth Scheer for an evidentiary hearing.  (JSF 1).  On January 13, 2014, ALJ Scheer issued a decision finding that Ms. DeJesus was not disabled under the Act.  (JSF 1).  On April 7, 2014, the SSA Appeals Council denied her request for review.  (JSF 1).  On June 5, 2014, Ms. DeJesus filed a complaint in this District.[3]  (JSF 1).  The parties thereafter agreed to remand the case for further proceedings, and by an Order dated August 5, 2014, the Court remanded the claim to the Commissioner for further administrative proceedings.  (JSF 1).

In an Order dated August 14, 2014, the Appeals Council remanded the claim for a new hearing and decision.  (JSF 1).  On January 28, 2015, ALJ Seth I. Grossman conducted a new

---

[1] In order to quality for DIB, one must be both disabled and insured for benefits.  42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.120, 404.315(a).  The last date a person meets the insurance requirement is the date by which the claimant must establish a disability.  Ms. DeJesus met the insurance requirements through June 30, 2016, and thus her disability must have begun on or before that date to quality for DIB.

[2] SSI, unlike DIB, has no requirement of being insured for benefits, but requires a showing of financial need.  20 C.F.R. § 416.202. The definition of disability is the same for both DIB and SSI, but the onset date for SSI is the date the claimant filed an application for benefits, and the benefits are limited to that date forward.

[3] DeJesus v. Colvin, No. 14 Civ. 4074 (JPO).

evidentiary hearing. (JSF 1). On October 27, 2015, ALJ Grossman held a supplemental hearing to obtain testimony from a vocational expert and an orthopedic expert. (JSF 1; R. 720). On January 20, 2016, ALJ Grossman issued a decision finding that Ms. DeJesus was not disabled under the Act. (JSF 1). Although he found that Ms. DeJesus had eight severe impairments— asthma, diabetes mellitus, hypertension, degenerative disc disease of the lumbar spine, depressive disorder, hammertoe and metatarsalgia of the foot, obesity, and bilateral knee arthritis—the ALJ concluded that the severity of Ms. DeJesus's impairments did not meet or medically equal the requisite criteria for a finding of disability. (R. 647). On February 18, 2016, Ms. DeJesus filed written exceptions to the ALJ decision, and on November 4, 2016, the SSA Appeals Council denied her request for review. (JS 1–2).

On January 6, 2017, after exhausting her administrative remedies as to ALJ Grossman's findings, Ms. DeJesus filed a complaint in the District of Connecticut. (ECF No. 1). On April 12, 2018 the case was transferred to this District. (ECF No. 23). Ms. DeJesus argues that the ALJ Grossman failed to appropriately weigh the medical evidence and failed to properly evaluate her credibility.[4] (ECF No. 13).

### B. Factual Background

#### 1. Non-medical Evidence

Ms. DeJesus was born in 1960 and was 50 years old as of her alleged disability onset date. (JSF 2). She has an eleventh grade education, and engaged in past relevant work as a service attendant, a hospital room cleaner, and a home health aide. (JSF 2).

---

[4] This report will focus on the decision by ALJ Grossman and will not address the previous administrative findings except to the extent necessary to evaluate his decision.

## 2. **Medical evidence**

### a. **Dr. Eric Walter, treating podiatrist**

Dr. Eric Walter, a podiatrist at Montefiore Medical Center, has treated Ms. DeJesus since at least December 18, 2009. (R. 423). In March 2011, Ms. DeJesus saw Dr. Walter for continued foot pain and swelling. (R. 418). At this appointment, Dr. Walter diagnosed her with bilateral hallux valgus deformities (bunions), hammertoe of the lesser toes, metatarsalgia (pain in forefoot), and equinus (a condition in which the upward bending motion of the ankle joint is limited). (R. 418). Dr. Walter prescribed Naproxen, an anti-inflammatory drug, and directed Ms. DeJesus to continue wearing her custom orthopedic shoes. (R. 418). He scheduled a follow-up appointment for three months, at which he would discuss the possibility of surgery if the pain had not resolved. (R. 418).

On July 7, 2011, Ms. DeJesus's foot pain had not resolved and she requested surgical intervention. (R. 420). On September 1, 2011 Ms. DeJesus's primary care doctor, Dr. Noel Brown, cleared her for surgery (R. 357), and on September 16, 2011, Dr. Walter performed a left bunionectomy with screw fixation, arthrodesis of the proximal interphalangeal joint ("PIP") of the second toe with pin fixation, a Weil osteotomy secondary metatarsal with screw fixation, and an arthroplasty of the fifth digit with hemiphalangectomy. (R. 353). Dr. Walter saw Ms. DeJesus several times over the next four months; each appointment revealed mild residual pain and mild swelling but overall normal post-operative healing. (R. 482–97). On December 20, 2011, Dr. Walter noted at the three-month post-operative appointment that Ms. DeJesus was scheduled to return to work on January 3, 2012, but she did not return to work then or at any later date. (R. 493; JSF 1). On March 29, 2012, Ms. DeJesus returned to Dr. Walter and reported pain and

swelling when wearing shoes. (R. 497). Imaging revealed post-operative edema and residual hammertoe deformity. (R. 298). Dr. Walter gave Ms. DeJesus injections of Lidocaine and Kenalog in the toe with the hammertoe deformity, and noted that she could walk and exercise in normal shoes to tolerance. (R. 298).

About a year later, on March 14, 2013, Ms. DeJesus returned to Dr. Walter complaining of increased pain. (R. 500). Imaging taken at this appointment indicated subluxation or dislocation of second toe consistent with a plantar plate tear and a contraction deformity of the third left toe. (R. 502). Ms. DeJesus requested surgical intervention, which was scheduled for May of 2013. (R. 502). Dr. Walter operated, and at her two-week post-operative appointment, Ms. DeJesus reported mild pain and Dr. Walter noted that the surgical wounds were well-healed, with no sign of infection and only mild edema. (R. 506). At her subsequent follow-up appointments, Ms. DeJesus continued to report mild pain and imaging revealed good healing, but with a lateral deviation and mild subluxation in the third toe, likely due to a bunion pression against the toe. (R. 509–12). In a November 19, 2013 progress note, Dr. Walter noted that the previous surgeries were not well healed, and that imaging evidenced the hammertoe deformity and contraction at the previous surgery site. (R. 606).

Ms. DeJesus continued to see Dr. Walter throughout 2014, and on April 30, 2014 he referred her to physical therapy to ease her intermittent foot pain associated with prolonged standing or walking. (R. 1008). Dr. Walter continued to recommend inserts, arch supports, toe spacers, and proper diabetic foot care to alleviate the pain. (R. 1008, 1498). On October 26, 2015, Dr. Walter renewed Ms. DeJesus's physical therapy referral for an additional four weeks, in order to increase the range of motion in her toe affected by the hammertoe deformity.

(R. 1505).  The record reflects that Ms. DeJesus regularly went to physical therapy as directed.  (See, e.g., R. 981, 1022–57).

As part of Ms. DeJesus's application for SSA benefits, Dr. Walter completed two Lower Extremities Impairment Questionnaires, the first dated June 10, 2013, and the second undated, but faxed to the SSA on October 27, 2015.  (R. 466, 1513).  As of the 2013 questionnaire, Dr. Walter had been seeing Ms. DeJesus monthly since December 2009, with her most recent appointment on June 6, 2013.  (R. 466).  Dr. Walter diagnosed Ms. DeJesus with metatarsalgia, plantar plate tear, and hammertoe, and noted that she also had diabetes mellitus.  (R. 466).  Dr. Walter supported his diagnosis with x-rays and clinical findings, namely that Ms. DeJesus had tenderness and limited range of motion in the MTPJ of the first, second and third toes, with swelling and joint deformity in her left foot.  (R. 466–67).  Dr. Walter noted her primary symptoms were throbbing and aching pain and swelling in her left foot, exacerbated by walking.  (R. 468).  Dr. Walter indicated that while she could ambulate and carry out activities of daily living independently, she used a cane to do so and pain interfered with her ambulation.  (R. 468).  Dr. Walter concluded that with these limitations, he would medically recommend that Ms. DeJesus not stand or walk continuously in a work setting, and that she could stand or walk for a maximum of one hour per day.  (R. 469).  Dr. Walter opined that she could frequently lift 0–10 pounds, occasionally lift 10–50 pounds, and could never lift over 50 pounds.  (R. 470).  He indicated that she could frequently carry 0–5 pounds, occasionally carry 5–20 pounds, and could never carry over 20 pounds.  (R. 470).  As to work, Dr. Walter stated that he believed Ms. DeJesus was capable of low-stress work, would likely be absent about one day per month, and that her pain would

seldom interfere with her attention and concentration. (R. 471–72). Finally, Dr. Walter stated that he did not think Ms. DeJesus's impairments would last twelve months. (R. 472).

In the 2015 questionnaire, Dr. Walter maintained his hammertoe diagnosis, and indicated that Ms. DeJesus also had diabetes mellitus and a degenerative condition. (R. 1513). He supported his diagnosis by citing to x-rays and clinical findings of limited range of motion, tenderness, muscle weakness, swelling and deformity in the left foot. (R. 1513–14). Dr. Walter listed Ms. DeJesus's primary symptoms as pain, weakness, and swelling, precipitated by walking. (R. 1515). Dr. Walter again noted that Ms. DeJesus could ambulate effectively with the assistance of a cane, but in this questionnaire opined that she could not carry out the activities of daily living independently without assistance. (R. 1515–16). However, Dr. Walter noted that Ms. DeJesus could travel to and from her home to appointments, could prepare meals, and could bathe and dress herself. (R. 1516). As for working, Dr. Walter's opinion slightly changed, in that he now believed Ms. DeJesus could sit for approximately 3-4 hours during the workday and stand for approximately 1-2 hours in a workday. (R. 1516). He recommended that Ms. DeJesus not sit or stand continuously in a work setting. (R. 1516). Dr. Walter indicated changes in her ability to lift and carry since the 2013 questionnaire. He now stated that Ms. DeJesus could occasionally lift 0–20 pounds but never lift over 20 pounds; that she could occasionally carry 0–20 pounds but could never carry over 20 pounds. (R. 1517). Dr. Walter stated that he believed Ms. DeJesus was capable of moderate-stress work (increased from low-stress in the prior questionnaire), would likely be absent about more than three times per month (up from about once per month), and that her pain would periodically interfere with her attention and concentration (versus seldomly

interfering).  (R. 1518–19).  Finally, Dr. Walter stated that he now believed Ms. DeJesus's impairments would last twelve months.  (R. 1518).

### b. Dr. Joseph Charles, treating psychiatrist

Dr. Joseph Charles provided psychiatric services to Ms. DeJesus at Federal Employment and Guidance Services ("FEGS").  On July 17, 2013, at the outset of Ms. DeJesus's treatment, Dr. Charles completed a psychiatric evaluation.  (R. 541).  Dr. Charles first noted biographical information; Ms. DeJesus was 51 years old at the time of her appointment, living with four of her children as well as her granddaughter, and that she reported a history of asthma, diabetes, foot problems and depressive symptoms.  (R. 541).  Dr. Charles assessed that Ms. DeJesus's perceived reliability was "fair" on a three-step scale of "good," "fair," and "poor."  (R. 541).  Ms. DeJesus explained to Dr. Charles that since losing her job, she had been experiencing, among other symptoms, sadness, lack of motivation, insomnia, irritability, and crying spells.  (R. 541).  She stated that her primary care doctor prescribed Citalopram, and that a social worker referred her to the FEGS clinic.  (R. 541).

In the Mental Status Examination part of the psychiatric evaluation, Dr. Walter indicated that Ms. DeJesus looked her stated age, dressed appropriately, and was alert and attentive, but lethargic.  (R. 544).  She was cooperative during the interview, and exhibited appropriate behavior, normal speech, and appropriate thought content.  (R. 544–45).  She described her symptoms as including sleep and appetite disturbance, anhedonia, helplessness, hopelessness and worthlessness.  (R. 544).  Dr. Walter noted that Ms. DeJesus presented with some ruminations and preoccupations, and that she had attempted suicide in the past.  (R. 545).  Dr. Walter indicated a depressed and constricted mood but found the mood appropriate for the

situation. (R. 546). In all areas of cognitive functioning, Dr. Walter assessed her as "good," but assessed her overall cognitive ability as "fair." (R. 546). Dr. Walter opined that Ms. DeJesus's judgment, insight into illness and impulse control were all age appropriate. (R. 546). Finally, Dr. Walter diagnosed her with major depression, recurrent, moderate, with obsessive traits. (R. 548).

On August 19, 2013, Dr. Charles saw Ms. DeJesus for a pharmacological management appointment. (R. 573). At this appointment, she reported feeling better and calmer. (R. 573). Dr. Charles reported no notable changes and renewed her medications. (R. 573). On the same day, Dr. Charles completed a Mental Impairment Questionnaire. (R. 515). Dr. Charles provided his diagnosis of Ms. DeJesus as major depression, recurrent, moderate with obsessive traits. (R. 515). He assessed her prognosis as "fair" and noted that her symptoms of sleep disturbance, mood disturbance, loss of interest, feelings of guilt, and difficulty concentrating all supported his diagnosis. (R. 516). Dr. Charles opined that these symptoms were reasonably consistent with her impairments, and found Ms. DeJesus to be moderately limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a regular schedule, work in coordination or proximity to others without being distracted by them, interact appropriately with the general public, get along with co-workers without distracting them, maintain socially appropriate behavior, and set realistic goals or make plans independently. (R. 517–20). Dr. Charles found her to have mild limitations in her abilities to: remember locations and work procedures, understand and remember simple instructions, carry out simple instructions, maintain an ordinary routine without supervision, make simple work-related decisions, ask

simple questions, respond appropriately to criticism from supervisors, be aware of normal hazards, and travel to unfamiliar places or use public transportation.  (R. 518–20).  Dr. Charles assessed Ms. DeJesus as having two marked limitations; first, in her ability to complete a normal work-week without interruptions from psychologically based symptoms, and second, in her ability to respond appropriately to changes in the work setting.  (R. 519).  Dr. Charles noted that although he expected Ms. DeJesus's impairments to last at least twelve months and that her psychiatric condition exacerbated her pain, she was capable of low stress work.  (R. 521).  He also noted that she would likely be absent from work more than three times per month.  (R. 522).

Dr. Charles continued to manage Ms. DeJesus's psychological medications.  (See, e.g., R. 568, 1109, 1116, 1123, 1131, 1137, 1143, 1149).  On October 15, 2015, Dr. Charles completed another Mental Impairment Questionnaire.  (R. 1507).  Dr. Charles noted that he had been treating Ms. DeJesus starting in July 2013, with her last appointment on June 17, 2015.  (R. 1507).  He maintained the 2013 diagnosis of Major depression, recurrent, moderate, with symptoms expected to last at least 12 months.  (R. 1507).  Ms. DeJesus's current symptoms included depressed mood, loss of interests, decreased energy, and decreased need for sleep.  (R. 1508).  Dr. Charles opined that Ms. DeJesus now had several additional limitations, and found her to be markedly limited in her abilities to perform activities within a schedule, work in coordination with others without being distracted by them, complete a workday without interruptions from psychological symptoms, perform at a consistent pace, be aware of hazards and take cautions, and set realistic goals.  (R. 1510).  Dr. Charles found Ms. DeJesus to be moderately-to-markedly limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, sustain ordinary routines without supervision, accept instructions and

respond appropriately to supervisors, respond appropriately to workplace changes, travel to unfamiliar places or use public transportation, and make plans independently. (R. 1510). Dr. Charles noted Moderate limitations in all other categories. (R. 1510). Finally, he stated that Ms. DeJesus would likely be absent more than three times per month, and that her symptoms applied as far back as September 6, 2011, her alleged disability onset date. (R. 1510).

### c. Jose Espinal, LCSW, treating therapist

Jose Espinal, LCSW, provided therapy services to Ms. DeJesus from June 2013 through at least early 2015. Mr. Espinal completed an initial assessment of Ms. DeJesus on June 15, 2013, and diagnosed her with major depressive disorder, recurrent, severe. (R. 1064). In conjunction with Mr. Espinal's treatment, Ana Rosa, LCSW, conducted a psychosocial assessment of Ms. DeJesus. (R. 550). As to appearance and behavior Ms. Rosa noted normal speech and thought content, with no evidence of disorder. (R. 551–52). Ms. Rosa assessed good cognitive functioning and insight but noted that Ms. DeJesus did not enjoy activities like she used to, and that her social activities and community and involvement were limited. (R. 552–54). At the time of this assessment, Ms. DeJesus was not employed, and Ms. DeJesus told Ms. Rosa that her physical limitations, including her arthritis, diabetes, and high blood pressure, prevented her from working. (R. 555). Ms. Rosa concluded that since being laid off, Ms. DeJesus's health had deteriorated, and she was stressed about relying on her children financially. (R. 560).

Mr. Espinal treated Ms. DeJesus weekly throughout 2013 and 2014. At her first appointment on July 20, 2013, Ms. DeJesus discussed her symptoms and how her depression affected her daily functioning. (R. 582). At this appointment her mood and affect were sad and depressed, but Mr. Espinal noted that she was able to talk and process her feelings. (R. 582).

Throughout 2013, Ms. DeJesus continued to express feelings of hurt and anger associated with her medical condition and current financial situation. (See, e.g., R. 571, 1105, 1116). She remained communicative and Mr. Espinal noted that Ms. DeJesus was gaining perspective on her negative automatic thoughts. (R. 1109, 1114). In early 2014, she experienced a period of preoccupation after the death of her aunt, and her mood became sad and depressed. (R. 1129, 1134). By March 2014, Mr. Espinal reported that Ms. DeJesus's preoccupation with her loss continued to reduce, and that she was feeling more hopeful about the future and more in control. (R. 1147).

On May 24, 2014, Mr. Espinal completed a Mental Impairment Questionnaire in connection with Ms. DeJesus's application for SSA benefits. (R. 969). Mr. Espinal noted that he first treated her in June 2013, with bi-monthly visits through the date of the Questionnaire. (R. 969). Mr. Espinal diagnosed Ms. DeJesus with major depression, recurrent, moderate, with psychosocial factors of health conditions, housing and financial issues. (R. 969). He indicated that he expected condition to last twelve months, and that her primary symptoms were feelings of guilt, sadness, irritability, difficulty thinking or concentrating, poor recent memory, decreased energy, and social withdrawal, among other symptoms. (R. 969–70). As clinical support for these findings, Mr. Espinal cited her forgetfulness and poor concentration. (R. 971). As to her limitations, Mr. Espinal assessed no marked or severe limitations, but noted several moderate, and moderate-to-marked limitations. (R. 972). Mr. Espinal assessed that Ms. DeJesus had moderate-to-marked limitations in her abilities to: understand and remember both simple and detailed instructions, and carry out those instructions, maintain attention and concentration, sustain ordinary routines without supervision, work in coordination with others without

distraction, complete a workday without interruptions from psychological symptoms, perform at a consistent pace, accept supervisor instructions and respond appropriately to supervisor criticism, respond appropriately to workplace changes, be aware of hazards, and travel to unfamiliar places.  (R. 972).  He assessed that Ms. DeJesus had moderate limitations in her abilities to remember locations and work-like procedures, perform activities on schedule, make simple work-related decisions, interact appropriately with the public, ask simple questions, get along with peers without distracting them, maintain socially appropriate behavior, adhere to basic standards of neatness, set realistic goals and make plans independently. (R. 972).  As to her ability to work, Mr. Espinal opined that her psychotic condition impaired her cognitive ability to function, and that she would be absent more than three times per month.  (R. 973).  He noted that he believed these opinions applied as far back as January 14, 2014.  (R. 973).

The record reflects that Ms. DeJesus continued to see Mr. Espinal regularly throughout 2015.  (See, e.g., R. 1151–1227).

### d.  Dr. Inessa Svistunova, SSA consultative internal medicine examiner

On March 21, 2013, Dr. Inessa Svistunova conducted a consultative internal medicine examination in connection with Ms. DeJesus's SSA application.  (R. 431).  At the time of the examination, Ms. DeJesus's chief complaints were neck pain, which she described as radiating and aggravated by movement, and back pain, which was aggravated with walking, stairs, bending and prolonged sitting.  (R. 431).  She reported experiencing numbness in her right hand, as well as numbness, weakness and pins and needles sensation in both lower extremities.  (R. 431).

Ms. DeJesus stated that she cooked twice a week, does laundry once a week, and performs childcare duties daily.  (R. 432).  She stated that she did not clean or shop, but that she

was able to take care of her own hygiene needs.  (R. 432).  At the examination, Ms. DeJesus appeared not to be in acute distress, and used no assistive devices.  (R. 432).  She walked with a slow and steady gait but declined to walk on heels and toes or squat. (R. 432).   During the musculoskeletal examination, Dr. Svistunova noted pain to palpation and spasms of cervical paraspinal muscles, pain to palpation of lumbar paraspinal muscle with spasm, and pain to palpation of right shoulder.  (R. 433).

Dr. Svistunova diagnosed Ms. DeJesus with neck pain, lower back pain, right shoulder pain, diabetes, hypertension, and asthma, and found her prognosis to be stable.  (R. 434).  Dr. Svistunova's Medical Source Statement opined that based on her examination and interview, Ms. DeJesus had mild limitations walking, climbing stairs, standing, sitting, bending, squatting, kneeling, pushing, pulling, lifting and carrying, all secondary to her lower back pain.  (R. 434).  Dr. Svistunova assessed moderate limitation with overhead activities due to her shoulder pain, and noted that she should avoid smoke, dust, and other respiratory irritants due to her asthma.  (R. 343).

### e.  Dr. Lucy Kim, SSA consultative psychologist

On October 22, 2013, Dr. Lucy Kim conducted a consultative psychological examination in connection with Ms. DeJesus's application for SSA benefits.  (R. 591).  At the time of this examination, Ms. DeJesus was 53 years old and was living with four of her children and two of her grandchildren. (R. 591).  She stated that she was unemployed due to medical issues.  (R. 591).  Ms. DeJesus informed Dr. Kim that she was currently seeing a psychiatrist once per month and therapist twice per month, and that she had been diagnosed with major depressive disorder.  (R. 591).  Ms. DeJesus explained that her symptoms included difficulty falling asleep and waking up

in middle of night, depressed mood, crying spells, guilt, hopelessness, and fatigue, among other symptoms. (R. 592). She reported auditory hallucinations for the past ten years, and cognitive issues including short term memory loss, concentration difficulties, difficulty learning material, long term memory loss, and difficulty finding words. (R. 592). As to daily functioning, Ms. DeJesus stated that she maintained her own hygiene and manages her own money, but that her daughter helps with the cooking, cleaning, laundry and shopping. (R. 593).

Ms. DeJesus was cooperative and responsive during the Mental Status Examination. (R. 592). Dr. Kim noted that Ms. DeJesus was dressed appropriately, had clear and expressive speech and exhibited coherent and goal directed thought processes. (R. 592–93). Dr. Kim found her mood and affect to be of full range and appropriate, and found her attention and concentration intact. (R. 593). Dr. Kim opined that her cognitive functioning was average, but that her memory was mildly impaired, possibly due to Alzheimer's disorder. (R. 593).

In her Medical Source Statement regarding functional limitations, Dr. Kim opined that Ms. DeJesus had mild limitations maintaining attention and concentration and had moderate limitations in learning new tasks and performing complex tasks independently. (R. 594). Dr. Kim found no evidence of limitations in her ability to follow and understand simple directions, perform simple tasks independently, maintain a regular schedule, make appropriate decisions, relate adequately with others and appropriately deal with stress. (R. 593–94). Dr. Kim concluded, "the results of the examination appear to be consistent with psychiatric problems and this may significantly interfere with claimant's ability to function on a daily basis." (R. 594). She diagnosed Ms. DeJesus with major depressive disorder, moderate with psychotic features, and found her prognosis to be "guarded given cognitive decline." (R. 594).

### C.  Administrative Proceedings

#### 1.  The first ALJ decision and the Appeals Council's remand order

On January 13, 2014, ALJ Kenneth L. Scheer issued the first ALJ decision in this matter, finding that Ms. DeJesus was not disabled under the Act.  (R. 72).

ALJ Scheer followed the five-step disability determination process.  As a preliminary matter, the ALJ found that Ms. DeJesus met the insured status requirements for her DIB application through June 30, 2016.  (R. 73).  At step one, ALJ Scheer found that Ms. DeJesus had not engaged in substantial gainful activity since her alleged onset date.  (R. 73).  At step two, the ALJ found that Ms. DeJesus had eight severe impairments:  metatarsalgia of the left foot, hammertoe of the 2nd and 3rd digits of the left foot, plantar plate tear of second MTPJ, varicose veins, asthma, obesity, diabetes, and a depressive disorder.  (R. 73).  At step three, the ALJ found that Ms. DeJesus did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act.  (R. 74).

ALJ Scheer determined that Ms. DeJesus had the residual functional capacity to perform light work, limited to simple, repetitive tasks and without exposure to dust, gases, fumes, or extreme temperatures.  (R. 75).  However, at step four, ALJ Scheer found that Ms. DeJesus was capable of performing her past work as a cashier, and thus did not proceed to step five.  (R. 83).

On March 18, 2014, Ms. DeJesus appealed ALJ Scheer's decision to the Appeals Council, arguing that the ALJ had failed to evaluate the opinions of the treating sources and had failed to make a proper residual functional capacity assessment.  (R. 326).  On April 7, 2014, the Appeals Council denied the request to review (R. 1), and, on June 5, 2014, Ms. DeJesus appealed to this Court (R. 752).

On August 6, 2014, the Commissioner and Ms. DeJesus stipulated that her case be remanded to the SSA for further administrative proceedings "to include the opportunity for a new hearing and decision." (R. 752). By an Order dated August 14, 2014, the Appeals Council remanded the case for rehearing, and provided explicit instructions to the ALJ on remand. The Appeals Council ordered the ALJ, on remand, to:

- Update the treatment evidence on the claimant's medical condition consistent with the requirements of 20 CFR 404.1512–1513 and 416.3912–913.
- Expressly evaluate the treating and examining medical source opinions cited above under 20 CFR 404.1527 and 416.927, Social Security Rulings 96-2p, 96-5pm and 96-6p. The Administrative Law Judge will explain the reasons for the weight he gives to this opinion evidence.
- Further consider the claimant's residual functional capacity on the updated record, citing specific evidence in support of the assessed limitations (20 CFR 404.1545 and 416.945).
- Further consider whether the claimant has past relevant work he could perform with the limitations established by the evidence (Social Security Rulings 82-61 and 82-62).
- As appropriate, secure supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-14 and 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(R. 770). ALJ Grossman was assigned Ms. DeJesus's case on remand.

## 2. Hearings before an ALJ Grossman

On January 28, 2015, ALJ Grossman held an initial hearing, at which Ms. DeJesus was represented by counsel. (R. 706). ALJ Grossman first established Ms. DeJesus's past relevant work, and then asked her why she could no longer do these jobs. (R. 708–14). She testified that

it was hard to be on her feet because she had orthopedic problems with her legs and back. (R. 714). She testified that she participated in physical therapy for her shoulder, back and knees, but that she had to stop because she did not have a good way of getting there and had a change in her insurance. (R. 716). After going through the evidence in record, ALJ Grossman issued subpoenas for additional evidence, and scheduled an additional hearing with testimony from an orthopedic expert and a vocational expert. (R. 719–20). The hearing was then adjourned. (R. 721).

On October 27, 2015 ALJ Grossman held a supplemental evidentiary hearing, at which Ms. DeJesus was again represented by counsel. (R. 666). ALJ Grossman began the proceedings by asking her about her employment history. (R. 670). She explained that she last worked in September 2011, and that her last long-term employment was as a Social Service Assistant at Montefiore in 2009. (R. 670–71). When asked if she was currently capable of working, she replied that she was not, due to her back pain. (R. 672). Ms. DeJesus explained that her job at Montefiore required her to stand most of the time, and required some pushing and lifting. (R. 674–75). She testified that she would not be able to do that job now because of its physical requirements. (R. 675). ALJ Grossman also inquired into her past work as a home health aide. (R. 675). Ms. DeJesus testified that she stopped that job because she was no longer able to keep up with her patient after her foot surgery. (R. 675–76).

Ms. DeJesus's counsel then asked her several questions, focusing on her foot operations and her foot pain. (R. 678–79). He then inquired into her knee and back pain, which she testified were caused by arthritis in the knees and sciatica in her back. (R. 679–80). She testified that she had previously attended physical therapy for her feet, knees, and back. (R. 681). Ms. DeJesus

also testified that she would be able to walk for about a block and a half without stopping, that she could stand for about one and a half to two hours before needing to sit, and that she could sit for about two hours before needing to adjust, all due to her constant pain. (R. 680–82). When asked about her daily activities, Ms. DeJesus replied that she was very depressed, but that she walked her dog to get out of the house. (R. 683). She explained that her daughters did the cleaning and grocery shopping, and that when she did accompany them, she used the electric scooter to get around the store. (R. 685–86).

The ALJ next questioned Dr. Brovender, the impartial medical expert called for the hearing. (R. 687). The ALJ asked, "What can you tell me?" (R. 687). Dr. Bovender recited some of Ms. DeJesus's medical history, noting her back and right shoulder pain, varicose veins, and her hammertoe deformity. (R. 687–88). When asked by ALJ Grossman "what limitations could you reasonably expect from all this?," Dr. Brovender replied, "Not much." (R. 688). ALJ Grossman asked if the hammertoe would cause any loss of function, to which Dr. Brovender replied, "[n]o, they would correct it, as far as I know." (R. 688). Dr. Brovender continued, testifying that there was no objective evidence in the record that Ms. DeJesus could only walk one block before stopping. (R. 690). Ms. DeJesus's counsel then questioned Dr. Brovender, first inquiring into the two foot surgeries. (R. 690–91). When asked if the need for a second surgery just two years after the first indicated an ongoing problem, Dr. Brovender testified, "[t]hey didn't mention that. I don't know. There's nothing in here that says there was a problem. I don't know." (R. 691).

Next, ALJ Grossman took testimony from a vocational expert. (R. 693). The expert established that Ms. DeJesus's past relevant work included her service attendant position at Montefiore and her time as a home health aide. (R. 695–96). ALJ Grossman asked the expert, "if

she could do the full range of light work, with only occasional overhead reaching, she could do the service attendant job; is that correct?" (R. 696). The expert stated that she could, then opined that her past work had occasional interactions with coworkers and the public, and that the service attendant job would not include exposure to chemicals. (R. 697).

Ms. DeJesus's counsel posed a hypothetical to the vocational expert: "If a person could sit for six hours and stand or walk for two hours, lift five to ten pounds frequently and lift 20 to 50 pounds occasionally, could a person do [Ms. DeJesus's] past [work]? (R. 699). The expert replied that they would not be able to. (R. 699). Counsel then asked, as to simple routine tasks jobs, if someone could do those jobs if they were off task for more than ten percent of the day or absent more than once a month; to which the vocational expert replied, "no." (R. 699–700).

In closing, Ms. DeJesus's counsel reiterated her treatment for depression, and objected to Dr. Brovender's testimony being given more than minimal weight based on the fact that it was inconsistent with the treating source opinions. (R. 701).

### 3. The ALJ's decision

On January 20, 2016, ALJ Grossman issued his decision denying Ms. DeJesus SSI and DIB benefits. (R. 641). He held that, "[a]fter careful consideration of all of the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from September 6, 2011, through the date of this decision." (R. 645).

ALJ Grossman followed the five-step disability determination process. As a preliminary matter, the ALJ found that Ms. DeJesus met the insured status requirements for her DIB application through June 30, 2016. (R. 647). At step one, ALJ Grossman found that Ms. DeJesus had not engaged in substantial gainful activity since her alleged onset date. (R. 647). At step

two, the ALJ found that Ms. DeJesus had eight severe impairments: asthma, diabetes mellitus, hypertension, degenerative disc disease of the lumbar spine, depressive disorder, hammertoe and metatarsalgia of the foot, obesity and bilateral knee arthritis. (R. 647).

At step three, the ALJ found that Ms. DeJesus did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act. (R. 647). (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings"). The ALJ found that Ms. DeJesus's hammertoe deformity and knee arthritis did not meet or medically equal Listing 1.02, dysfunction of major joints, because they did not involve a weightbearing joint resulting in an inability to ambulate effectively. (R. 648). ALJ Grossman opined that the record did not reflect the requirements of Listing 1.04, for disorders of the spine, nor the criteria in Listing 3.03, for asthma, which requires a prescribed number of attacks evidenced by pulmonary function tests. (R. 648). ALJ Grossman also considered Ms. DeJesus's hypertension and obesity, although neither have individual listings. (R. 648).

In discussing Ms. DeJesus's mental impairment, ALJ Grossman explained that he first assessed whether the "paragraph B" criteria of Listing 12.04 covering depression were met. (R. 649). To satisfy paragraph B, the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning (activities of daily living, social functioning, maintaining concentration, persistence, or pace). (R. 649). ALJ Grossman found that Ms. DeJesus had only mild to moderate limitations in the broad areas of functioning, and thus the paragraph B criteria were not satisfied. (R. 650). ALJ Grossman also considered whether the "paragraph C" criteria of the Listings were satisfied, and concluded that there was no evidence of ongoing

medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing with only marginal adjustment, as required by the paragraph.  (R. 650).

ALJ Grossman assessed Ms. DeJesus's residual functional capacity as being able to perform light work with some limitations.  (R. 650).  ALJ Grossman concluded that Ms. DeJesus could perform simple tasks, have occasional interactions with coworkers and the public, and could understand and carry out instructions, maintain attention and concentration, interact appropriately with others, and keep a regular schedule, all within normal work expectations. (R. 650).  ALJ Grossman stated that his RFC finding was supported by the testimony of Dr. Brovender, an impartial orthopedic medical expert.  Accordingly, at step four, ALJ Grossman found Ms. DeJesus capable of performing her past work as a service attendant.  (R. 656).  Because he determined Ms. DeJesus capable of performing her past work, he did not proceed to step five. (R. 657).

### 4.  The Appeals Council decision

On February 18, 2016, Ms. DeJesus filed written exceptions to the ALJ's decision and a request for review to the Appeals Council.  (R. 852).  By letter dated November 4, 2016, the Appeals Council found no reason to review the ALJ's decision and denied the request.  (R. 621).

### 5.  The cross-motions

On January 6, 2017, Ms. DeJesus filed the Complaint in this action, alleging that the Commissioner's decision was erroneous and not supported by substantial evidence.  (ECF No. 1). The parties have cross moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (ECF Nos. 12, 16).

Ms. DeJesus raises two points:  (1) that the ALJ failed to properly weigh the medical opinion evidence; and (2), that the ALJ failed to properly evaluate Ms. DeJesus's credibility.  (ECF No. 13). The Commissioner argues that the decision is supported by substantial evidence.  (ECF No. 17).

### III.  DISCUSSION

#### A.  Applicable Legal Standards

##### 1.  Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a

mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.  See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009).  To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. § 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. § 416.920b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82–83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

### 2. Standards for Benefit Eligibility

For purposes of SSI and DIB benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(3)(B). In reviewing a claim

of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988); 20 C.F.R. § 404.15; 20 C.F.R. § 416.927.

Under SSA regulations, disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v). The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof. At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-

Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### 3.  **Treating Physician Rule**

The SSA regulations require the ALJ to give "controlling weight" to "the opinion of a claimant's treating physician as to the nature and severity of the impairment . . . so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess, 537 F.3d at 128 (internal citation omitted); accord Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927([c])(2)).

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.  20 C.F.R. § 416.927(c).  The ALJ must give "good reasons" for not crediting the plaintiff's treating physician.  20 C.F.R. § 416.927(c)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (explaining that Appeals Council had "an

obligation to explain" the weight it gave to the opinions of the non-treating physicians). After considering these factors, the ALJ must fully set forth his reasons for the weight assigned to the treating physician's opinion. Burgess, 537 F.3d at 129.

While the ultimate issue of disability is reserved to the Commissioner, the regulations make clear that opinions from one-time examining sources that conflict with treating source opinions are generally given less weight. 20 C.F.R. § 416.927(c)(2). See also Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); Cabreja v. Colvin, No. 14 Civ. 4658 (VSB), 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015) (explaining that opinions of one-time consultants should not overrule those provided by the treating medical sources unless there are "serious errors" in treating sources' opinions). Failing to apply proper weight to a treating physician's opinion is reversible error. Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015).

### 4. Assessing claimant credibility

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) —i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. § 404.1529(c)(1). If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." 20 C.F.R. § 404.1529(c)(1). To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility. Meadors v.

Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts." Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. § 416.929(c)(3)]." Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these steps, remand is appropriate. Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects. SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017). These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors

concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4.

### B. Evaluation of the ALJ's Decision

The Court finds that the ALJ failed to comply with the remand order from the Appeals Council by failing to "expressly evaluate the treating and examining medical source opinions . . . explain[ing] the reasons for the weight" given, and by failing to pose hypothetical questions to the vocation expert that "reflect the specific capacity/limitations established by the record as a whole." (R. 644). Specifically, ALJ Grossman failed to apply the proper legal standards in weighing the opinions of Dr. Walter, Ms. DeJesus's treating podiatrist, and Dr. Charles, Ms. DeJesus's treating psychiatrist. In addition, remand for a further evidentiary hearing is appropriate because the ALJ failed to apply the proper legal standards in weighing Ms. DeJesus's credibility, in that he failed to consider all relevant evidence (or, at least failed to explain his implicit rejection of relevant evidence).

#### 1. Weight of the medical opinion evidence

##### a. Dr. Eric Walter

Ms. DeJesus alleges that the ALJ erred by failing to properly weigh the opinion of her treating podiatrist, Dr. Walter. (ECF No. 13 at 1). Here, ALJ Grossman afforded "little weight" to Dr. Walter's opinion in the June 2013 Lower Extremities Impairment Questionnaire "because it was during an acute period in the claimant's treatment and is not representative of her functionality during the period at issue as a whole." (R. 653). As the ALJ noted, this questionnaire was completed approximately two weeks after Ms. DeJesus had foot surgery. (R. 466). However, nowhere in the record is it indicated that Dr. Walter's opinions were limited to her post-surgical

condition, rather than based on his longitudinal treatment of Ms. DeJesus. At the time of the questionnaire, Dr. Walter had been treating Ms. DeJesus monthly for four years. (R. 466). The opinions expressed in the questionnaire are supported by longitudinal progress notes, as well as clinical findings from before and after her surgeries, such as limited range of motion, swelling, and joint deformities. (R. 467). Dr. Walter repeatedly noted that pain was Ms. DeJesus's primary concern, and that it interfered with her movement, and would likely cause one absence a month from work. (R. 4669, 471). There is no indication that these opinions are limited to a specific time period, and if the ALJ believed them to be, he should have requested such clarification from Dr. Walter. Otherwise, there is no reason to discredit these opinions which are based on longitudinal and detailed treatment records.

The ALJ similarly gave "little weight" to Dr. Walter's updated 2015 Lower Extremities Questionnaire, this time "because Dr. Walter's record reveal[ed] only mild pain in the left foot with scarce objective findings such as loss of sensation or strength to support the restrictions or absences he asserted." (R. 655). In the 2015 questionnaire, Dr. Walter maintained his hammertoe diagnosis, supported by x-rays and clinical findings of limited range of motion, tenderness, muscle weakness, swelling and deformity in the left foot. (R. 1513–14). Dr. Walter listed Ms. DeJesus's primary symptoms as pain, weakness, and swelling, precipitated by walking. (R. 1515). Dr. Walter again noted that Ms. DeJesus could ambulate effectively with the assistance of a cane, but in this questionnaire opined that she could not carry out the activities of daily living independently without assistance, which could be attributed to the passage of two years between questionnaires. (R. 1515–16). At every appointment of record Ms. DeJesus complained of pain, and even after two surgeries she was still experiencing "radiating pain" in her left foot,

exacerbated by wearing shoes, standing and walking.  (R. 606, 1008, 1012, 1498).  Dr. Walter's treatment records reflect continual complaints of pain, and he noted in November of 2013 that "no surgeries are well healed."  (R. 606).

Dr. Walter's finding of muscle weakness and the repeated complaints of more than mild pain in the treatment records directly contradict the ALJ's assertion that "Dr. Walter's record reveal[ed] only mild pain" and that there were "scarce objective findings such as loss of sensation or strength to support the restrictions."  (R. 655).  Accordingly, the ALJ was likely required to give this opinion "controlling weight" as Dr. Walter's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Burgess, 537 F.3d at 128 (internal citation omitted); accord Green-Younger, 335 F.3d at 106.  If the ALJ determined that less that controlling weight was appropriate, he was nevertheless required to consider the factors listed in 20 C.F.R. § 416.927(c) when determining the weight to be given to that opinion.  ALJ Grossman did not address these factors, even implicitly, and as such failed to comply with the treating physician rule or the remand order, which directed him to "expressly evaluate the treating and examining source opinions."  (R. 644) (emphasis added).

In addition, opinions from one-time examining sources that conflict with treating source opinions are generally given less weight.  20 C.F.R. § 416.927(c)(2).  Despite the fact that many of Dr. Walter's opinions were consistent between the two questionnaires and supported by other record evidence, ALJ Grossman afforded "great weight" to the opinion of the testifying—but non-treating—orthopedic expert Dr. Brovender, who stated that there was no objective support for

Ms. DeJesus's allegations that she can walk only one block and cited to specific treatment notes to support his opinion. (R. 656).

Contrary to the ALJ's description, Dr. Brovender's testimony was vague and he was unable to address direct questions about Ms. DeJesus's medical record. (R. 687–91). He began his testimony by reading out the results of several of Ms. DeJesus's examinations, providing no analysis until asked by ALJ Grossman, "what limitations could you reasonably expect from all this?," to which Dr. Brovender replied, "[n]ot much." (R. 688) When pressed on any potential limitations caused by the hammertoe deformity, including the ability to stand or walk, Dr. Brovender replied, "[n]o, they would correct it," and continued "there [were] no post-operative x-rays . . . her toes should be straight." (R. 688–89). This statement evidences Dr. Brovender's unfamiliarity with the record. First, radiographs were taken during at least four post-operative appointments, and the results were included in Dr. Walter's contemporaneous treating notes. (R. 506, 509, 512, 606). In late 2013, radiographs showed a contraction deformity in Ms. DeJesus's left foot, with subluxation at the site of her previous surgery. (R. 606). As of the April 30, 2014 progress note, Dr. Walter had officially re-diagnosed "hammertoe deformity of the fourth toe," and referred Ms. DeJesus to physical therapy. (R. 1008). Thus, the ALJ's grant of "great weight" to Dr. Brovender's opinion and his reliance on that opinion in declining to afford treating podiatrist Dr. Walter's opinion controlling weight was unsupported by the evidence and necessitates remand.

### b.  Dr. Joseph Charles

Ms. DeJesus alleges that the ALJ also erred by giving "little weight" to the marked limitations described by treating psychiatrist Dr. Charles in his 2013 Mental Impairment

Questionnaire. (ECF No. 13 at 5). While ALJ Grossman gave "little weight" to the marked limitations, he accorded Dr. Charles's opinion "significant weight" as to the findings that Ms. DeJesus had at most moderate limitations in several areas of work activity. (R. 654). The ALJ stated that "the marked limitations are not supported by the treatment records or Dr. Charles's own mental status examination." (R. 654). As with Dr. Walter, ALJ Grossman did not cite to any evidence as to the why this treating source opinion should not be given controlling weight, and did not go through the prescribed factors when such weight is not afforded, especially as to one part of the opinion but not the other. (R. 654). The Court notes that while Dr. Charles's treating records are sparse, they are longitudinal and supplemented with records from other clinicians at the FEGS clinic.

Although opinions from one-time examining sources that conflict with treating source opinions are generally given less weight, ALJ Grossman afforded consultative examiner Dr. Kim's opinion "significant weight," because it was "well supported by her evaluation findings." (R. 654). While Dr. Charles's records may not include extensive detail, they do evidence limitations in the broad areas of functioning, which ALJ Grossman did not assess or sufficiently include in his determination of Ms. DeJesus's residual functional capacity. Further, the ALJ's assessment of Ms. DeJesus's mental limitations did not consider Dr. Kim's finding that Ms. DeJesus's psychiatric problems "may significantly interfere with claimant's ability to function on a daily basis." (R. 594).

*        *        *        *

On remand, and with appropriate weight granted to the opinion of Dr. Brovender, if the ALJ maintains that the opinions of Dr. Walter and Dr. Charles do not merit controlling weight, and grants greater weight to the opinions of one-time consultative examiners, he must explain his

decision using the prescribed factors. 20 C.F.R. §§ 404.1529. On remand the ALJ is also directed to adequately analyze the potential limitations of mental functioning when determining Ms. DeJesus's residual functional capacity.

## 2. **Vocational expert testimony**

In granting Ms. DeJesus a further evidentiary hearing after her first complaint in this District, the Appeals Council directed the ALJ to "secure supplemental evidence from a vocational expert" and noted that "[t]he hypothetical questions [to the vocational expert] should reflect the specific capacity/limitations established by the record as a whole." (R. 644). The order continued, "[t]he Administrative Law Judge will ask the vocation expert to identify examples of appropriate jobs and to rate the incidence of such jobs in the national economy." (R. 644). ALJ Grossman did not comply—he did not ask the vocational expert any hypothetical questions, let alone a hypothetical that included all of Ms. DeJesus's alleged symptoms, and did not have the expert identify examples of appropriate jobs available in the national economy. (R. 689–90). Instead, the ALJ offered his own assessment, and asked the expert whether he agreed. After establishing Ms. DeJesus's past relevant work, the entirety of ALJ Grossman's questioning of the vocational expert follows:

ALJ: Those – those are simple task instruction jobs; correct?
VE: Yes.
ALJ: And do they have more than occasional – is there any psychiatric alleged here counsel?
ATTY: Yes, Yes.
ALJ: Okay would they have more than occasional contact with supervisors, coworkers or the public?
VE: it's occasional.
ALJ: Occasional okay. So it's simple task instructions. It's occasional. Does it have any exposure to concentrated chemicals or pollutants?
VE: So if the job was just to take the food back and forth, it's not the cleaning also, they don't use irritants or pollutants.

| | |
|---|---|
| ALJ: | Okay, so the service attendant doesn't have it; right? |
| VE: | Right. |
| ALJ: | Okay. |
| VE: | The – the other job could have been. |
| ALJ: | Okay. |

(R. 696–97).  As evidenced by the above, ALJ Grossman did not comply with the Appeals Council's remand order, and must do so on remand from this Court.

### 3. Evaluation of Ms. DeJesus's credibility

Ms. DeJesus also contends that the ALJ did not properly evaluate her credibility.  (ECF No. 13 at 5).  ALJ Grossman found that while Ms. DeJesus's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]"  (R. 656).  In support, the ALJ noted that while some reduction in strength and range of motion appear in the record, they are not so severe as to preclude light work.  (R. 656).  He also justified his decision because her alleged limited daily activities could not be verified, and noted that even if they were true, it would be difficult to attribute the limitation to her medical condition.  (R. 656).

The ALJ does not cite to any record evidence to support his assessment of Ms. DeJesus's credibility.  As noted above, when a claimant reports symptoms that are more severe than medical evidence alone would suggest, the regulations require the ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has

taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4. ALJ Grossman did not engage in this analysis.

Additionally, ALJ Grossman erred by finding Ms. DeJesus not credible because her limitations in activities of daily living could not be "objectively verified." (R. 656). Courts have rejected this reasoning because these types of statements are impossible to verify. See, e.g., Beardsley v. Colvin, 758 F.3d 834, 837 (7th Cir. 2014) ("Whatever uncertainty may exist around such self-reports is not by itself a reason to discount them—otherwise, why ask in the first place?—and the relevant regulations specifically allow ALJs to consider claimants' 'daily activities.' 20 CFR §§ 404.1529(a), 416.929(a). By the ALJ's reasoning, the agency could ignore applicants' claims of severe pain simply because such subjective states are impossible to verify with complete certainty, yet the law is to the contrary."). An applicant is not required to verify statements regarding her stated limitations in daily activities, and thus here, ALJ Grossman improperly dismissed Ms. DeJesus's stated limitations.

ALJ Grossman also ignores the cross-corroborating and longitudinal evidence of Ms. DeJesus's pain throughout the record. Ms. DeJesus discussed her foot pain with her Primary Care Doctor, Dr. Noel Brown, who cleared Ms. DeJesus for both foot surgeries, referred Ms. DeJesus for physical therapy, and opined in her Impairment Questionnaire that Ms. DeJesus had daily foot pain on a scale of six or seven out of ten. (R. 357, 451, 474). Ms. DeJesus also discussed her pain

with Dr. Charles and Mr. Espinal at FEGS, and her physical limitations were noted in her comprehensive psychological treatment plans.  (See, e.g., R. 550, 562, 1065, 1234).

As explained above, the ALJ did not engage the required analysis for determining the credibility of a claimant's symptoms and their limiting effects as required by 20 C.F.R. §§ 404.1529 and 416.929(c)(3).  Further, because a claimant's credibility can only be properly assessed upon the correct application of the treating physician rule, as the treating physician's opinion contributes significantly to the evidence that is weighed in determining a claimant's credibility under these factors, the ALJ's failure to apply that rule properly impacted his assessment of Ms. DeJesus's credibility.

### C.  Appointments Clause Challenge

Ms. DeJesus claims that the ALJ was not constitutionally appointed at the time of the decision in this case and, therefore, lacked the power to decide her claim.  (ECF No. 27).  Article II, Section 2, Clause 2 of the Constitution provides, in pertinent part, that only the President, "Courts of Law," or "Heads of Departments," can appoint "Officers" of the United States.  Actions taken by an "Officer" of the United States who was not appointed in accordance with the Constitution appear to have no legal effect.  See Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018).  The Commissioner opposes Ms. DeJesus's Appointments Clause challenge on the ground that she waived any such challenge by failing to raise it at any point in the administrative process.  (ECF No. 30).

In the context of Social Security proceedings, the overwhelming majority of district courts have held that Lucia requires challenges under the Appointments Clause to be raised during the administrative proceedings; courts have found that a plaintiff's failure to do so operates as a waiver.  See, e.g., Kimberly B. v. Berryhill, No. 17 Civ. 5211 (HB), 2019 WL 652418, at *14–15

(D. Minn. Feb. 15, 2019); Michelle Alicia S. v. Berryhill, EDCV 17-2115-JPR, 2019 WL 631913, at *3 n.6 (C.D. Cal. Feb. 14, 2019); Axley v. Comm'r, Soc. Sec. Admin., 18 Civ. 1106-STA-cgc, 2019 WL 489998, at *1–2 (W.D. Tenn. Feb. 7, 2019); Shipman v. Berryhill, 17 Civ. 00309-MR, 2019 WL 281313, at *3 (W.D.N.C. Jan. 22, 2019); Dierker v. Berryhill, 18 Civ. 145-CAB (MSB), 2019 WL 246429, at *2–4 (S.D. Cal. Jan. 16, 2019), adopted by 2019 WL 446231, at *1 (S.D. Cal. Feb. 5, 2019); A.T. v. Berryhill, 17-4110-JWB, 2019 WL 184103, at *7 (D. Kan. Jan. 14, 2019); Stearns v. Berryhill, 17 Civ. 2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept. 14, 2018).

Ms. DeJesus concedes that her Appointments Clause challenge was not raised before the ALJ or the Appeals Council. (ECF No. 27) ("this objection was not made when this case was pending before the Agency"). Her challenge to the constitutionality of the ALJ's appointment is, therefore, denied as untimely. See Bonilla-Bukhari v. Berryhill, 357 F. Supp. 3d 341, 349–51 (S.D.N.Y. 2019) (collecting cases following Lucia where the Courts have concluded that exhaustion before the ALJ is required).

## IV.    CONCLUSION

For the reasons set forth above, Ms. DeJesus's motion for judgment on the pleadings (ECF No. 12) is GRANTED and the Commissioner's motion (ECF NO. 16) is DENIED. The Commissioner's decision denying benefits is vacated, and this matter is remanded to the agency for further proceedings.

The Clerk of Court is respectfully directed to close this case.

Dated:      New York, New York
            March 9, 2020

                                        SO ORDERED

                                        _____
                                        SARAH L. CAVE
                                        United States Magistrate Judge